is the second case of the morning called 211-0116. In re Commitment of Robert E. Brown. On behalf of the Adelante, Ms. Jillian Gosch. On behalf of the athlete, Ms. Erica Siever. Ms. Gosch, are you ready to proceed? My name is Jillian Gosch and I represent Mr. Brown. Hold this down a little bit so we can hear you better. Thank you. Is that better? I think if you speak up it will be. I'll do my best. I represent Mr. Brown. On January, in January 2002, Mr. Brown was subjected to a petition to commit. The state called as their one and only witness a Dr. Anthony Schaub. Dr. Schaub testified in court and ultimately found that, ultimately testified that Mr. Brown would be substantially probable to commit future sexual offenses. And the court found that there was probable cause to hold Mr. Brown over for trial. Mr. Brown's case had a quite lengthy period before it went to trial. But in 2008, the people filed a motion for an updated Department of Corrections evaluation. Defense counsel objected to that motion. There was a hearing. Ultimately, Judge Foreman granted the people's motion and a second IDOC evaluation was granted. Mr. Brown went to trial in April 2010 and was found sexually violent. And that's why the case is before your honor today. One of the issues that I addressed in my brief was the fact that the court did allow that second IDOC evaluation to take place. Our argument is that it, in essence, allowed the people to have three evaluators instead of two evaluators, which is what the statute sets forth. The statute indicates that they are allowed to have the human services evaluator as well as the IDOC evaluator. But when Judge Foreman granted their new motion for the second evaluator, that that was improper. Counsel? Thank you. If we look at the plain language of the statute, doesn't Section 35B really address the testimony that the state may present rather than the number of evaluations? By the plain language of the statute, it does say that they may call a Department of Corrections evaluator or and the human services evaluator. So I understand what the court is saying in that respect. However, it does not say that they're entitled to more than one evaluation either. But it's silent on that. Yes, it is. It is silent, correct? Correct. How do you read silence as being a prohibition? That's what you're doing. Well... Right? I mean... Yes, but that leads me to, I guess, the other issue of what's fair. Because in other parts of the statute, the defendant, Mr. Brown, is limited in how many evaluations or what type of evaluations that he can have. If he chooses not to cooperate, he's limited in having a non-examining... He can't have an examiner come in and talk to him and say, I evaluated him and have him testify. The evaluation is limited to just a records review. And in this circumstance, what ultimately is happening here, though, is if they had this other evaluator come in, the other evaluator was able to develop further, use different testing. They were able to gather more information on Mr. Brown. However, you're referring to a case that talks about the quality of evidence, equal quality of evidence. Yes. Applying that rule specifically to this case, first of all, obviously the respondent spoke to his evaluator and refused to speak to the state's. So there's an inherent advantage in that in the quality of evidence. Okay? Secondly, and perhaps this is important, did the respondent ever ask for another expert in this case? To my knowledge, Judge, it doesn't reflect that in the record. Well, would that be taken against the state on that? He could have had another evaluator if he chose to ask for one, theoretically, right? Probably not, because he is entitled to the one evaluator. It's not the typical practice of the county to appoint additional evaluators for the defendant. If he doesn't like the response that he gets from his evaluator, then that evaluator is not called to testify on his behalf. He's not entitled to, I guess, forum shop or evaluator shop for another evaluator. But you can call our attention to no case that stands for the proposition that what happened in this case, two evaluators, which are authorized, are prohibited from referring to an earlier evaluation. Do you have any case law that stands for that proposition you're asking us to adopt? No, I do not. Okay. And now the jury never heard Dr. Schaub's diagnosis or his professional opinion, correct? Dr. Schaub's opinion was, if you review Dr. Buck's report, she does a very thorough job of containing in her report Dr. Schaub's findings. It was testified to in certain areas. Certain parts of Dr. Schaub's testimony was taken in court, and it was all contained in Dr. Buck's report. But there was no testimony specifically that Dr. Schaub's opinion was such and such. I mean, there weren't two opinions that were elicited through Dr. Buck, correct? There were not two opinions where someone came out and said Dr. Schaub concluded A, B, C, D, and E. But he was referenced, and it was made known to the jury that he was an evaluator and did actually evaluate and speak with Mr. Brown back in 2002. And I just wanted to clarify that for you, Justice Hudson. I do believe that Mr. Brown actually spoke with Dr. Schaub, and that was the reason that Dr. Roselle was allowed to evaluate and then testify in court. Later on when Dr. Schaub did not testify, you're correct, Mr. Brown did not cooperate with either Dr. Quackenbush or Dr. Buck. And at the time of the hearing schedule, and because of the delay in this case, we have an unusual situation, but at the time of the scheduling of this hearing, the petitioner, the state, was entitled to present testimony from both the IDOC evaluator, who was Dr. Buck, and the Department of Human Services psychologist, who was Dr. Quackenbush. That's correct. And so those were the people at the time. Correct. If you read this literally. Yes. All right. Yes. And part of our argument to the court is that had Dr. Schaub been unavailable, which he was, I guess, not there to testify, Dr. Quackenbush could have testified during the course of his testimony as to Dr. Schaub's findings. He relied upon them when he was making his evaluation. There would have been no prejudice to the people had they not had a second evaluator. The fear in this case was, as I pointed out in my brief, is that the jury apparently had a very difficult time coming to a conclusion in this case. And one of the things that struck me after reading the record was that it could have been one of those situations where they were in the back and they found, well, we've got three people out here that have evaluated or reviewed his record specifically, and they only have the one. And, you know, if three doctors are telling me I might develop cancer in three years if I don't take this pill, that's going to strike fear in me as opposed to one saying it's not going to happen. And that's essentially what these cases are about. They play on the jury's fears. And when you've got more than one person telling them that this is likely to happen, they're more likely to be influenced by that. And ultimately, in this case, I think I believe that it's truly what happened. The jurors did send out a note saying that they could not come to a conclusion in this case, and I think ultimately it would have come down to the experts' opinions in this case. And the fact that the state was allowed to have essentially three qualified persuasive experts while the defendant only had the one certainly worked in his disfavor. Well, it also could have been the fact that he had been in custody for, what, 20 years at this time or close to it? Yes, Judge. And they're thinking, they could have been thinking just as easily, well, you know what, he's been there for 20 years. How do we know what he's going to do? Absolutely, Judge. It could have had nothing to do with how many experts testified. It could have been strictly the fact that 20 years had passed and maybe it was his turn to get out. It could have been that, Judge, and you're right. So we're speculating. We are speculating. And it's interesting that you brought that up because Mr. Brown had spent 20 years in the Department of Corrections, and in that entire time he was in the Department of Corrections, he's had no sexual issues at all. Well, there are some discrepancies. There are some discrepancies. I know that there was an issue brought up by Dr. Quackenbush, that there was a female guard that had walked into the room while he was dressing or undressing, and Mr. Brown explained his position on that. Other than that, and besides his convictions, which were 20-plus, you know, he'd had several prior to the 20-year sentence, there was nothing. Well, except don't we have to consider, or doesn't the trial judge have to consider, or I'm sorry, the fact finder, the opportunity as well. I mean, he was incarcerated, essentially. He was. And so with pretty strict rules and regulations in terms of contact with people, and certainly no contact, I would assume, with the outside world, so to speak. So the opportunity certainly was diminished. I agree with you that the opportunity was diminished or at least changed. However, there are females that work in the Department of Corrections, and you'll have to remember that Mr. Brown was also in the DHS facility at Rushville for approximately eight years where he was working in the laundry, he was working in the commissary, he was doing, he had an off-site job, which was the laundry, where he was working with females, and there were no incidents other than the one. So are we sort of segwaying into your next argument? Yes, Judge. It sounds like the reasonable doubts. Yes, Judge. I think you're already into it. I'm going into it. So I know you're actually into it. I'm sorry. I'm a little nervous. So he had been off-site. He had no issues other than the one that I just mentioned to Justice Hutchinson. And let me just say this about the issue with the reasonable doubt. I mean, the courts have already decided that the testing is appropriate, and that's the law. However, other than that, other than their prediction of this future risk, they had no specific instances that they could point to within the past 20 years other than the one where they could even have any shred of evidence that Mr. Brown was suffering from any type of paraphilia. Dr. Rozelle, who's an expert in his field, testified that he didn't even believe that Mr. Brown was suffering from paraphilia initially. He qualified his report, explained why he had changed his diagnosis. Initially, he apparently found Mr. Brown did suffer from paraphilia, but then went on to explain that he retracted that diagnosis because of what was going on with the DSM and did not feel that it applied to Mr. Brown. But unless somebody, unless we have that situation where there's an expert who then retracts a diagnosis, it is a diagnosis that isn't a, quote, temporary diagnosis. It's a diagnosis that somebody gets or has that doesn't disappear, so to speak. I mean, it's a condition. Correct, and as Dr. Quackenbush pointed out in his testimony that once a person develops paraphilia, it's a lifelong illness that needs to be treated. So that's what we have. We have Quackenbush, and we have Buck testifying he suffers from paraphilia. Then you've got the respondent's doctor initially said he was diagnosed with that but then rescinded. So isn't that for the trier effect? I mean, generally, that's something the trier effect matters that go to the credibility and the weight of the evidence are within the province of the trier effect. We are not really supposed to substitute our judgment. So if you've got two witnesses on one side, one and the other, why wouldn't that be proof beyond a reasonable doubt? Judge, I think you need to look at the fact that there is quite a discrepancy or disagreement in the medical community about whether or not paraphilia and OS non-consensus is actually a real diagnosis. Rape has been specifically excluded from the DSM, and it has been excluded on four occasions by the mental health professionals. They don't believe that it is a valid diagnosis. By the way, is this all in the record? I was just going to ask that. Was this specifically in the record and argued or testified to by the experts? Dr. Grozel didn't speak on the record in regards to what was meant by the paraphilia and non-consent. Did he say it's not a legitimate diagnosis? I don't believe he used that phraseology. Well, you're sort of indicating that it is, so you need to be careful about that. Okay, well, it has been excluded from the DSM. They have not included coercive paraphilia as a valid diagnosis within the book. And the reason for that is that they've made the determination that rape is a criminal offense, that it's not a mental disease. And so in Mr. Brown's case, where he has been convicted several times, multiple times of rape, and no other issues with small children that would lend to any other diagnosis in the book in regards to a sexual issue, that is why Dr. Grozel rescinded his diagnosis. He said that initially, if there's a conviction for rape, that it's automatic paraphilia. And that is found in the record. So the element that they didn't prove, if I'm understanding you, is that a mental condition existed. Correct. All right. Was there any other diagnosis other than paraphilia? Yes, I believe that Dr. Buck diagnosed Mr. Brown with suffering from antisocial personality disorder. That is a valid designation, as it were. And Dr. Quackenbush diagnosed not antisocial personality disorder, but a personality disorder with antisocial tendencies. He felt he did not have enough evidence to or information to make the full-on antisocial disorder. And is there some indication that those disorders were identified, or that, well, they are two different ones, but that disorder was identified based upon the fact that he had engaged in fights or he had been maybe unruly but for a rather strict structure that the laundry could provide, that the commissary could provide, but if he was left basically to his own devices, it was likely he could get in trouble. Yes, there was quite a bit of evidence in Mr. Brown's master DOC file that indicated that he had quite severe anger issues that caused a lot of fighting. Even though he had gone through, wasn't there testimony that he had gone through a lot of programs or anger management programs and things of that nature? He testified that he went through some anger management programs. Wasn't it something like, I've done everything that they offered? That's what he testified to. I believe that's an exact quote, but there was no record of that with the DOC master file. Okay. All right, you'll have an opportunity for rebuttal. And Ms. Seaborn? Yes. Good morning, Your Honors, Counsel. Good morning. May it please the Court. Erica Seaborn from the Illinois Attorney General's Office here on behalf of the state. I'd like to begin with the issue of the expert witnesses. First, as Your Honor pointed out, the relevant statute here would be Section 35B, which has the permissive language saying that the state may present an expert from both DOC and from DHS. There's simply no statutory language that prohibits the state from effectively replacing their DOC expert after the initial expert retires. In terms of the case law, it seemed that Your Honor's question was referring to this Court's decision in the Korta case. And Korta really isn't applicable here. The problem in Korta was that Mr. Korta ended up at a severe evidentiary disadvantage. He had no way of countering the state's expert witnesses because he had refused to participate in the state evaluations. Here, pretty much the opposite happened. Respondent's expert, Dr. Louis Rozell, had examined respondent multiple times, and he was allowed to testify to the jury about that examination. He was in the opposite position of Mr. Korta. He didn't have any evidentiary disadvantage. So Korta really doesn't apply. But the law was different then, I'm sorry. Yes, the statute has since been amended so that a Korta-like situation will no longer arise. But on a more granular level, excuse me, Your Honor. Well, I want to just point out the fact that Dr. Buck testified he wouldn't communicate with me, and that's part of the record. And Dr. Rozell said we had numerous conversations, and that's part of the record, which is something, again, as Justice Hudson has said, the trier of fact has to take that into account, correct? Yes, and certainly when Dr. Buck was cross-examined, I would point out for the record that Dr. Buck did have an informal conversation with Mr. Brown. I believe it was for her 2009 addendum. She stated he refused to sign the consent form, but then he talked to me anyway, and they did have a conversation. So really, I don't even think that the current statute would have prevented Dr. Rozell from testifying at all since he did have a conversation with Dr. Buck. But I suppose on a more granular level, respondents simply haven't shown that he suffered any sort of prejudice as a result of Dr. Buck replacing Dr. Schaub. Both state experts testified that they had read Dr. Schaub's report, but as Your Honor pointed out, they never told the jury what Dr. Schaub's diagnosis was or what the substance of his conversation with Mr. Brown was. The only time that the substance of Dr. Schaub's report came up is when respondents' own counsel asked the state's expert about things that were in Dr. Schaub's report. And of course, the jury was instructed that the expert evaluations and the records that they relied on are not in themselves evidence. They can only be considered for the weight of the expert opinions that rely on those evaluations. And of course, juries are presumed to follow the court's instructions. As to the jury, the question of whether or not this was a close case and whether the jury had any difficulty coming to a decision, the record indicates that when the jury sent out a note saying that they couldn't agree, it was 7.15 p.m., and the court noted that at that point they had been deliberating for only two hours. So they sent them back to deliberate some more, and it seems that they came to a verdict at some point during that evening. So the record doesn't reflect that this was the sort of case where the jury had gone back and forth for multiple days and was simply unable to come to a decision. So, therefore, the record doesn't support counsel's argument that this case was so close that the number of the state's experts was the thing that pushed the jury over the edge. When, of the four elements essentially that need to be proven, one is that the defendant suffers from a mental condition. Must that mental condition relate back to the fact that he was convicted of a sexually violent crime? In other words, if he wasn't found to be a paraphilia, diagnosed paraphilia, would the antisocial behavior have been sufficient? Well, the statute itself just says mental disorder. So the statute doesn't instruct that the mental disorder has to be necessarily related to the sexually violent offenses. So, hypothetically, the antisocial personality disorder, which I would note both the state experts and respondent's own expert also diagnosed him with, could qualify as the qualifying mental disorder even if we left out the paraphilia. But in terms of the paraphilia, really that's a question of the weight of the evidence, not its admissibility. Here, Dr. Rozelle was able to testify about why he did not believe that paraphilia was an appropriate diagnosis, and the state's experts were cross-examined about this. But this is an issue that has been dealt with and grappled with by many courts in this state, including this very court. In this court's very recent decision in the commitment of Hooker, paraphilia was the underlying diagnosis. So while this is certainly something that experts can disagree about and can be brought before the jury, that really comes down to the credibility contest between the experts. And that's a matter within the province of the twelfth act, is it not? Yes. When we're dealing with the sufficiency of the evidence issue, it's not enough to just say my expert is more credible than your expert. You have to look at it in the light most favorable to the state and figure out whether any rational juror could possibly have believed the state experts. In terms of the sufficiency of the evidence, the only other things that I would note is that first, the paraphilia diagnosis, as testified to by Dr. Quackenbush, is a chronic condition. It's not something that goes away simply because he's been incarcerated with very limited access to non-consenting females. And another issue is the fact that although Respondent was ordered to complete sex offender treatment during his parole back in the late 80s, he never completed it, he still hasn't completed it. Even in DHS, he has refused to participate in any formal sex offender treatment and he testified himself that he said that he does not think that he needs the treatment and doesn't see it as beneficial to him. Again, the jury heard that particular evidence. Yes. Mr. Brown was able to testify and essentially he had his chance to convince the jury that he was not an SVP. I'll briefly touch on the conditional release issue because that is somewhat related. But again, that is an abuse of discretion standard and the trial court laid out on the record every single factor that it considered. It clearly credited the state expert over Dr. Roselle. The fact that his age had increased was not enough to make him appropriate for conditional discharge, nor was the fact that he hadn't committed any new sexual offenses while in prison because again, he hadn't had the opportunity to do so. Did he have any sort of support system outside of the Department of Corrections that was identified? The trial court specifically found that he did not have an appropriate support system and under the statute as was then applicable, that was a factor that was appropriate for the court to consider in addition to the fact that if he were in DHS custody, he would have more of an opportunity for sex offender treatment as well as better supervision than he would on the outside. Unless the court has any other questions at this time, we urge this court to affirm the judgment of the trial court. Thank you very much. Ms. Gosch, do you have any rebuttal? I do. All right, thank you. Thank you both for your arguments here this morning. Sorry we were a little delayed. That first one went on and on. We will take this matter under advisement and enter a decision in due course. Thank you.